# First District Court of Appeal
## State of Florida

_____

No. 1D2023-1681
_____

ELLIS MIGUEL CLARK,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Escambia County.
Coleman Lee Robinson, Judge.


February 12, 2025


WINOKUR, J.

    A jury found Ellis Miguel Clark guilty of first-degree murder. Clark challenges that conviction, raising two issues on appeal. We affirm both but write to address the first—whether the trial court erred in denying Clark's motion for judgment of acquittal. We find that, when viewed in the light most favorable to the State, the evidence supports Clark's conviction.

## I

## A

Teleah Billingsley is the hub that connects the participants in a Pensacola drug deal that resulted in a shooting death. Her ties to the persons in this case are as follows:

(1) Billingsley was close friends with Marcus Atienza. Billingsley saw Atienza almost every other day. Occasionally, Atienza sold marijuana to Billingsley. Whenever she wanted to purchase marijuana from Atienza, Billingsley would text or call him.

(2) Billingsley knew Delarian Gaffney since high school. In the fall of 2021, Billingsley and Gaffney were dating. Gaffney lived at his grandmother's house on Pond Avenue in Pensacola, Florida.

(3) Billingsley and Nicholas Wells went to middle school and high school together. They were acquaintances, but not friends.

(4) Billingsley knew Clark through Gaffney, his brother.

On November 7, 2021, Billingsley was in her white Jeep Grand Cherokee with Gaffney, Wells, and Clark. Gaffney was driving, Billingsley was in the front passenger seat, and Wells and Clark were in the backseat. They wanted marijuana, and Billingsley suggested that Atienza could sell it to them.

At 4:12 p.m., Billingsley texted Atienza, and then gave her phone to Gaffney. Gaffney texted Atienza to meet at a vacant house on Rawls Avenue. That vacant lot was less than one-half mile from Gaffney's grandmother's house on Pond Avenue. Rawls Avenue runs parallel to Pond Avenue and Juniper Avenue, with Devane Street intersecting all three.

Gaffney drove to a location that Billingsley did not recognize. When they arrived, Wells and Clark got out, and then Billingsley and Gaffney engaged in sexual intercourse. After about five or ten minutes, Billingsley and Gaffney heard gunshots. A couple of minutes after that Wells and Clark ran back to Billingsley's car.

Wells and Clark ran from the direction of the gunshots. Wells had money and Clark had baggies of marijuana. Wells got into the backseat behind Billingsley; Clark got into the backseat behind Gaffney. Both Wells and Clark were, according to Billingsley, "panicking in the back seat."

Gaffney drove to his grandmother's house on Pond Avenue. When they got there, Gaffney gave the keys to Billingsley and told her to go home. When Billingsley arrived home, she found sandwich baggies as well as Atienza's identification card in the backseat.

Between 4:00 p.m. and 5:00 p.m., Dionte Gaitor was inside his house on Rawls Avenue. After hearing his dog make a "threatening bark," Gaitor ran out his back door. With an unobstructed view of a vacant house just to the south of his property, Gaitor saw a black car with two black males standing near the front of the car on the driver's side. One was wearing white, and the other was wearing black. Gaitor could not see the driver. The black car "was trying to back up." One of the two people standing by the car said: "Don't back up." The one dressed in white used a "big size weapon" to shoot inside the car. The firearm looked like an automatic weapon about two feet long. The shooter pointed the firearm from his shoulder down into the car. Gaitor heard two shots. Gaitor then closed his door, and his wife called the police. Looking through the windows at the front of his house, Gaitor saw the black car parked in a field across the street on the east side of Rawls Avenue. Gaitor saw the two black males who were earlier standing by the car now rummaging through the car. The two men then ran away on foot.

A little before 5:00 p.m., Rickie Fontenot was sitting on the porch with his wife; they live at the intersection of Juniper Avenue and Devane Street. Fontenot heard gunshots. Thirty seconds to a minute later, Fontenot saw two men running down Juniper from the north. Fontenot could not see the men's faces or even "what color they were." Fontenot did not see either man carrying a firearm. Both men entered the backseat of a white SUV parked in the yard of Fontenot's neighbor. As soon as the rear doors closed, the white SUV slowly headed south on Juniper. The windows of the SUV were "blacked out." A security video camera captured the white SUV as it drove past.

At 4:48 p.m., law enforcement issued a call to the scene of the shooting on Rawls Avenue. Escambia County Sheriff's Deputy Hunter Hatcher was nearby assisting with a traffic stop when he heard gunshots "a couple of blocks over" near Rawls Avenue. When he arrived at the scene, Deputy Hatcher "observed a black sedan in the middle of an open dirt lot on the east side of Rawls Avenue." The driver's side door was open. After speaking briefly with Gaitor, Deputy Hatcher saw Atienza in the driver's seat, who appeared to be deceased.

Investigator Bobby Guy also responded to the incident on Rawls Avenue. Investigator Guy received "a description of a white SUV, possibly a Jeep Cherokee" from Fontenot who saw other individuals get into that car and leave."

Crime Scene Technician Brittany Higgins responded to the incident on Rawls Avenue as well. Higgins found one .223 caliber shell casing at the abandoned house next to Gaitor's residence. Higgins did not find any other shell casings. That caliber is very common and is used in rifles like an AR-15. According to Higgins, a rifle round has a "longer, thinner" casing whereas a pistol round has a "shorter, little bit bulkier bullet inside the casing."

The headlights were on, and the driver's side door was open in Atienza's car. Atienza had a bullet entrance wound behind his left ear with an exit wound above his right eye. Atienza also had a bullet entrance wound "just near his left nipple area" with an exit wound on the right side of his back. Residue on a red hat he was wearing suggested that Atienza was shot in the head at close range.

Inside the car, Higgins found "some money, some baggies, and a backpack." The backpack contained "a couple of baggies, a black digital scale, as well as some green, leafy substance."

Prints from Clark's hand were lifted from the driver's side door of Atienza's car and the hood on the driver's side. Prints from Wells' finger were lifted from the exterior of the rear driver's side door. No DNA samples taken from the victim's car identified Clark as a possible contributor.

4

Officers located a white SUV in the driveway of Billingsley's residence. During a subsequent search of Billingsley's home, no firearms were found, but Atienza's identification was found in Billingsley's backpack/purse. Prints lifted from plastic baggies inside Billingsley's backpack/purse included prints from Atienza, Clark, and Billingsley.

Prints from Clark's hand were lifted from the interior rear driver door frame of Billingsley's white Jeep Cherokee. Prints from Wells' fingers were lifted from the exterior rear passenger window. Gaffney's prints were found on the driver door, gas cap, and trunk. Clark "was included as a possible [DNA] contributor to a mixed DNA profile" from the interior front driver's side door.

At Gaffney's residence, officers found a .40 caliber magazine and one .40 caliber round. The .40 caliber round did not contain any identifiable fingerprints. Officers also found mail addressed to Clark.

A grand jury indicted Clark with first-degree murder through the discharge of a firearm. The Indictment alleged first-degree premeditated murder, first-degree felony murder, and principal to murder—all in the alternative:

> [D]id unlawfully from a premeditated design to effect the death of a human being to wit: Marcus Emmanuel Atienza, *or* while engaged in the perpetration of or an attempt to perpetrate a felony, to wit: robbery, *or* as a principal thereof, did kill and murder, or did aid and abet another who did kill and murder Marcus Emmanuel Atienza[.]

(emphases supplied). Finally, the Indictment alleged that Clark "did personally carry, display, use, or threaten to use and actually possessed and discharged a firearm[.]"

Officers arrested and interviewed Clark. During the interview, Clark claimed that he was "fucked up" because he "do[es] drugs." Clark denied knowing who shot the victim. Clark

denied being present when the victim was shot. Clark denied being in a white Jeep Cherokee. Clark denied knowing Wells.

B

During opening statements at Clark's trial, the State presented a theory that the victim was shot by two different firearms. According to the State, both Clark and Wells shot Atienza. One used a larger caliber firearm that left a quarter-inch entrance wound to the victim's head; the other used a smaller caliber firearm that left a one-eighth inch entrance wound to the victim's side. The shot to the side occurred first; the shot to the head occurred after Atienza drove away, when Clark and Wells chased Atienza and one of them shot him in the head.

At the close of the State's case, Clark moved for a judgment of acquittal. Regarding premediated murder, Clark argued that the State presented no evidence of him possessing a weapon, firing a shot, or committing an act that would result in Atienza's death. Regarding felony murder, Clark argued that the State made no showing of any plan to commit a robbery or any other felony. Clark did not challenge the State's evidence regarding principal culpability. The trial court denied the motion.

During closing arguments, the State argued that both Clark and "his accomplice," Wells, shot and killed Atienza for his money and marijuana. The State argued that each of them shot using different firearms. It described the murder as follows: "[Atienza] survived the first shot, the shot that went through his torso, long enough to drive his car across the street into the vacant lot where his murderers chased him down, shot him again, this time, to the head from approximately two inches away."

The State argued that "it is not strictly necessary to prove who actually shot [Atienza.]" The State asserted that Wells and Clark "are both guilty of both felony murder and premeditated murder." According to the State, "there is evidence to prove both felony murder and premediated murder due to the unique circumstances of this case."

The State argued that Wells and Clark shared an intent to rob Atienza of marijuana and money; then, after the first shot was fired, both Wells and Clark shared an intent to kill Atienza as evidenced by the fact that they chased him down to "finish him off." Thus, for felony murder, the State argued a shared intent to rob Atienza; for premeditated murder under a principal theory, the State argued a shared intent to kill Atienza after the first shot was fired.

During his closing argument, Clark's counsel highlighted the lack of direct evidence linking him to any premeditated murder of Atienza: "No one can put a gun in [Clark's] hands. No one can testify they saw him shoot or carry or do anything regarding a firearm." Clark also challenged the State's evidence as to any shared intent to commit a robbery, noting that no witness testified about a plan to commit a robbery.

Using a general verdict form, the jury found Clark "Guilty of First-Degree Murder, as charged." The trial court imposed a mandatory life sentence.

C

Clark argues on appeal that "the State's evidence failed to support either a felony murder theory or a premeditated murder theory." According to Clark, "[n]o evidence was presented that [he] had any common plan to rob or kill the decedent, nor was any evidence presented that [he] was the one who shot the decedent." As below, Clark does not challenge the sufficiency of the evidence as to the State's theory of principal culpability.

As to felony murder, Clark argues that the State only proved that he possessed an intent to purchase marijuana. With regard to premeditated murder, Clark argues that the State failed to establish that Clark possessed a specific intent to kill the victim.

In response to Clark's felony murder argument, the State argues that Clark's actions, after the shots were fired, show an intent to rob Atienza. As for premeditated murder, the State argues that "[t]he act of shooting the victim twice and at close range in the head is sufficient to show premeditation to kill."

7

Additionally, the State argues that, because Clark and Wells followed Atienza after the first shot, the evidence is sufficient for the jury to find Clark and Wells were both principals to the crime of premeditated murder.

## II

The statutory elements of the offense of first-degree premeditated murder are as follows:

  i. "The unlawful killing of a human being:"
 ii. "When perpetrated from a premeditated design to effect the death of the person killed or any human being."

§ 782.04(1)(a)1., Fla. Stat. The elements of first-degree felony murder are, in pertinent part, as follows:

  i. "The unlawful killing of a human being:"
 ii. "When committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any . . . Robbery[.]"

§ 782.04(1)(a)2.d., Fla. Stat.

The two vary only in intent. Premeditated murder requires an intent to kill, whereas felony murder requires an intent to commit the underlying felony. *See*, *e.g.*, *Ragan v. State*, 49 Fla. L. Weekly D2183 (Fla. 3d DCA Oct. 30, 2024) (discussing the differences between premeditated murder and felony murder).

Finally, criminal liability as a principal is outlined in section 777.011, Florida Statutes as follows:

> Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.

"[T]o be guilty as a principal for a crime physically committed by another, one must intend that the crime be committed and do some act to assist the other person in actually committing the crime." *See Staten v. State*, 519 So. 2d 622, 624 (Fla. 1988) (citations omitted).

First-degree felony murder and first-degree premeditated murder under a theory of principal in the first-degree both require a shared intent. Whereas the former requires a shared intent to commit the underlying felony, the latter requires a shared intent to kill. *Compare* William R. LaFave, *Substantive Criminal Law* § 13.2(c) (3rd ed. 2018) ("[B]ecause first degree [premeditated] murder requires a deliberate and premeditated killing, an accomplice is not guilty of this degree of murder unless he acted with premeditation and deliberation.") *with id.* ("Brief mention should also be made here of the somewhat unique results as to accomplice liability which may flow from [the] application of the felony-murder and misdemeanor-manslaughter rules. Under these doctrines, the actor in committing a felony or dangerous misdemeanor is liable for a killing which occurs in the execution of such crimes, and there is no requirement that he have intended the homicide[.]"); *see also* 40 C.J.S. *Homicide* § 29, n.1 (2014) ("To be guilty of intentional murder as an accomplice to the act, a defendant must have intended for the victim to be killed.").

Thus, a defendant may be found guilty of first-degree murder under a felony murder theory or a principal to premeditated murder theory even if the defendant did not actually kill the victim. *See e.g.*, *State v. Aguiar*, 418 So. 2d 245, 246 (Fla. 1982) (holding that a defendant who "was present, aiding and abetting the commission or attempt of one of the violent felonies listed in the first-degree murder statute" is "equally guilty, with the actual perpetrator of the underlying felony, of first-degree murder").

Indeed, the defendant need not be present when the killing occurs. *See State v. Amaro*, 436 So. 2d 1056, 1060–61 (Fla. 2d DCA 1983) (holding that "it is not [ ] necessary that the accused be present at the time of the killing perpetrated by a cohort[,]" as long as the homicide was "committed in furtherance of the common criminal scheme, or as a probable, predictable, reasonably foreseeable, or causally connected result of the underlying felony."

(citations omitted)); *see also Sievers v. State*, 355 So. 3d 871, 883 (Fla. 2022) (noting that premeditated murder under a principal theory does not require presence at the murder).

## III

### A
### First-Degree Premeditated Murder

In its opening statement, the State told the jury that both Wells and Clark shot Atienza. This suggests that the State intended to prove Clark's guilt based, at least in part, on a theory of first-degree premeditated murder independent of any principal culpability.

Even presuming (without deciding) that the evidence does not support the prosecutor's claim that Clark—rather than Wells— actually shot Atienza, the lack of evidence showing Clark was a triggerman does not support reversal. *Cf. Van Poyck v. State*, 564 So. 2d 1066, 1069 (Fla. 1990) (finding that evidence insufficient to show that the defendant was the triggerman, but finding that the evidence was sufficient to convict of first-degree felony murder).

### B
### Principal in the First-Degree
### to First-Degree Premeditated Murder

The State also asserted that Clark was guilty as a principal to first-degree premeditated murder. To show that Wells and Clark shared an intent to kill Atienza, the State argued that, after the first gunshot, both Wells and Clark chased Atienza down to "finish him off." According to the State, this showed that Wells and Clark were acting in concert and were principals to the same crimes.

Viewing the evidence in the light most favorable to the State, we conclude that the evidence supports the State's theory that Wells *and* Clark intended to "finish" Atienza. Thus, even if Wells shot Atienza both times, a jury could reasonably conclude that Clark was guilty of first-degree premeditated murder as a principal in the first degree.

10

## C
## First-Degree Felony Murder

The State also asserted that Wells' and Clark's pursuit of Atienza showed that they shared an intent to rob Atienza. Viewing the evidence in the light most favorable to the State, a jury could reasonably conclude that Wells and Clark shared an intent to rob Atienza and that the second gunshot was done in furtherance of that common design.

Accordingly, the evidence was sufficient to support the verdict and judgment of first-degree murder.

AFFIRMED.

OSTERHAUS, C.J., and LEWIS, J., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

Jessica J. Yeary, Public Defender, and Kathryn Lane, Assistant Public Defender, Tallahassee, for Appellant.

Christina Piotrowski, Assistant Attorney General, Tallahassee, for Appellee.